SUSAN JANE RITTER, APPELLANT AND CROSS-APPELLEE, V. GARY DOUGLAS RITTER, APPELLEE AND CROSS-APPELLANT.

450 N.W.2d 204

Filed January 12, 1990. No. 89-125.

Mark S. Bertolini, of Bertolini, Schroeder & Blount, for appellant.

James E. Case for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

In an appeal from the judgment entered by the district court for Cass County in a proceeding to dissolve the marriage of Susan Jane Ritter and Gary Douglas Ritter, neither party claims the court erred in the division of marital property. However, Susan Ritter contends that the district court erred in failing to (1) grant Susan the custody of the parties' child, Travis Ritter, rather than granting custody to Gary Ritter; (2) award more than $500 as an attorney fee for Susan's lawyer; (3) retain legal custody of Travis and grant physical custody of the child to Susan; (4) appoint a guardian ad litem for the minor, Travis; and (5) provide suitable visitation rights for Susan in view of Travis' custody granted to Gary. In his cross-appeal, Gary claims that the district court committed error in requiring Gary to pay alimony to Susan and in failing to order Susan to pay child support for Travis.

Before marrying Gary Ritter, Susan Hefner obtained an associate degree in home economics from Central College in McPherson, Kansas, and was the mother of Melissa Hefner, who was born on August 16, 1982. Susan married Gary on October 1, 1983. The Ritters lived with Melissa in a two-bedroom home in Murray, Nebraska, while Susan worked part time at the office of the Cass County treasurer in Plattsmouth and Gary farmed leased land and worked as a part-time janitor.

Within a few months of the marriage, the Ritters' marital relationship began to deteriorate rapidly. The couple fought frequently, usually about Susan's poor housekeeping, and quarreled about family finances. Gary prohibited Susan's driving the family car to visit friends, apparently because gasoline was high priced, and would not allow Susan to make long-distance phone calls. In his anger with Susan, Gary became withdrawn and indifferent toward Susan, but would give her no explanation for his moodiness. Susan felt that Gary was always angry, so that she constantly "walked on eggshells"

when they were together. In August 1984, the Ritters sought professional marriage counseling from a certified counselor, Joyce Williams, who met frequently with the couple, but the marital problems persisted. Although Gary discontinued the counseling, Susan continued.

When Susan was 6 months pregnant with Travis, Gary struck Susan during a dinner table dispute in the presence of Melissa. The Ritters' marital relationship seemed to improve with the birth of Travis on May 4, 1985. However, early in 1987, Gary threatened to leave with Travis and go to the home of Gary's parents in Pennsylvania. After a violent argument with Susan, who was pregnant with the couple's second child, Gary decided not to leave and remained in the Ritter house with Melissa, Travis, and Susan. The couple's second child, Jeffrey, was stillborn in February 1987. Sometime in June 1987, Gary and Susan decided to get a divorce, but, for financial reasons, continued to live together in Murray. On occasion, Gary would reprimand Melissa for certain things and would not correct or discipline Travis for the same conduct which was the basis for the reprimand of Melissa. Gary's farming activities required most of his time, which left Susan mainly responsible for rearing the children. During the fall of 1987, Susan frequently left the Ritter house and "escaped" to local bars to meet her friends, male and female, since there were no other places for her to meet with friends. In October, Gary moved from the family home. Shortly thereafter, Susan moved to an apartment in Plattsmouth where she lived with Melissa and Travis. Susan had an extramarital affair with a male friend and dated several other men, although neither Melissa nor Travis ever saw Susan with a boyfriend. Susan filed a petition for dissolution of marriage in November 1987.

At the time of trial, Melissa was 6 years of age and Travis was 3 1/2. Although Susan Ritter had requested that the court appoint a guardian ad litem for Travis, the court declined to make such appointment. There was testimony concerning three irresolute events characterized as Susan's attempts to "harm herself." In 1984, Susan took a handful of Extra-Strength Tylenol, but sustained no adverse reaction. In 1986, she took a partial bottle of erythromycin, an antibiotic, for which she was

taken to a hospital for a 2-hour observation. In 1987, Susan inflicted "scratches" with a razor blade on her wrist, but no medical attention was necessary. The marriage counselor, who had continued to counsel Susan after the divorce action was filed, indicated that Susan's "overall health" improved after marital stress was eliminated by the Ritters' separation. Similar observations were expressed by other witnesses. Williams, the counselor, verified the strong bond between Melissa and Travis and expressed the opinion that it was important that Travis be in Susan's custody with Melissa. Other witnesses bore out the extremely strong bond between Melissa and Travis.

Susan commenced full-time employment with the county treasurer's office on August 1, 1988, and described the day-care arrangements for Travis and Melissa while she worked. The children were at a day-care center from 8 a.m. until 5:15 p.m., when Susan came for the children after work and took the children to their home. Susan's parents, who reside in Plattsmouth, have a good relationship with Melissa and Travis and visit frequently with the children. Susan's gross earnings were $1,046 per month with net earnings of $907 monthly.

Gary testified that he worked in Omaha from 10:30 each weeknight until 7 o'clock the following morning. His traveltime, from Murray to Omaha and return, was just under 2 hours. For that reason, if Travis were with Gary during the week, Travis would be in the care of a babysitter from approximately 9 p.m. until 8 o'clock the next morning. Gary offered no evidence about the daily care for Travis outside arrangements for a babysitter when Gary was at work. Consequently, the record does not indicate arrangements for Travis while Gary would be sleeping during weekdays. Also, Gary's present residence is located where there are few young children who might be playmates for Travis. Moreover, Gary never disputed his abuse of Susan, especially during her two pregnancies during the Ritter marriage.

In disposing of the various issues in the Ritter dissolution proceeding, the district court made no explicit finding of fitness regarding either Susan or Gary and expressed no determination concerning the best interests of Travis Ritter regarding the custody question. Neb. Rev. Stat. § 42-364 (Reissue 1988)

provides in part: "Custody and visitation of minor children shall be determined on the basis of their best interests." However, the district court, in addition to making a division of marital property, granted custody of Travis to Gary Ritter, subject to Susan Ritter's visitation rights. Also, the court ordered Gary to pay Susan alimony of $100 per month for 2 years and an attorney fee of $500 for Susan's lawyer. The court did not order child support concerning Travis.

## STANDARD OF REVIEW

In an appeal involving an action for dissolution of marriage, the Supreme Court's review of a trial court's judgment is de novo on the record to determine whether there has been an abuse of discretion by the trial judge, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the Supreme Court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Huffman v. Huffman*, 232 Neb. 742, 747-48, 441 N.W.2d 899, 903-04 (1989). See, also, *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988); *Christen v. Christen*, 228 Neb. 268, 422 N.W.2d 92 (1988). Child custody in a proceeding to dissolve a marriage is a matter within the trial court's discretion. *Peterson v. Peterson*, 224 Neb. 557, 399 N.W.2d 792 (1987).

## ALIMONY AWARD

When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

Neb. Rev. Stat. § 42-365 (Reissue 1988).

The Supreme Court evaluates the amount of alimony in reference to the factors contained in § 42-365. For a decree pertaining to alimony, a court should consider, in addition to the specific criteria listed in § 42-365, the income and earning capacity of each party as well as the general equities of each situation. The ultimate test for determining correctness in the amount of alimony is reasonableness. *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986); *Ritchie v. Ritchie*, 226 Neb. 623, 626, 413 N.W.2d 635, 637 (1987) ("In addition to the factors set out in § 42-365, the income and earning capacity of each party must also be considered").

Considering the statutory factors affecting alimony, we note that Gary has gross monthly income of approximately $1,387 and that Susan has gross monthly income of $1,046. Both parties have had full-time employment during their marriage. However, neither Gary nor Susan interrupted "personal careers or educational opportunities," see § 42-365, as the result of their marriage. Each party is capable of self-support. Given the duration of the Ritter marriage for approximately 4 years, and after our de novo review, we conclude that the district court abused its discretion in awarding alimony to Susan. Therefore, the district court's judgment regarding alimony is reversed.

## ATTORNEY FEES

Susan claims that the $500 attorney fee awarded by the district court is insufficient. An award of an attorney fee in a marital dissolution proceeding is a matter within the trial court's discretion, is reviewed de novo on the record, and will be affirmed on appeal in the absence of abuse of discretion.

> The award may depend on a variety of factors, including the nature of the case, the amount of property divided and alimony awarded, the earning capacity of the parties, the services performed and results obtained, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case.

*Ritchie v. Ritchie, supra* at 627, 413 N.W.2d at 638. Under the circumstances, the district court did not abuse its discretion in awarding an attorney fee of $500. The district court's judgment

concerning the attorney fee is, therefore, affirmed.

## GUARDIAN AD LITEM

Susan Ritter contends that the trial court erred in declining to appoint a guardian ad litem for Travis Ritter. Although a guardian ad litem may be appointed pursuant to Neb. Rev. Stat. § 42-358(1) (Reissue 1988) in a marital dissolution proceeding, such appointment is a matter within a trial court's discretion. *Chalupa v. Chalupa*, 220 Neb. 704, 371 N.W.2d 706 (1985); *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980). Susan has failed to demonstrate any prejudice from the absence of a guardian ad litem. The rule, succinctly stated, is: No prejudice, no reversal. The district court's declination to appoint a guardian ad litem is affirmed.

## CUSTODY OF TRAVIS RITTER

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988); *Peterson v. Peterson*, 224 Neb. 557, 399 N.W.2d 792 (1987). Thus, in a marital dissolution proceeding, child custody is denied to an unfit parent or a fit parent when the best interests of the child require such denial of custody.

"Nonexistent at common law, divorce is a matter within the exclusive and supreme province of the Legislature, subject to limitations imposed by the Constitutions, state and federal." *Else v. Else*, 219 Neb. 878, 880, 367 N.W.2d 701, 703 (1985). There is no statutory definition or characterization of a parent's fitness or unfitness in reference to a child custody issue in a proceeding to dissolve a marriage. Yet, parental fitness may be a factor in determination of a child custody question in a dissolution proceeding. For that reason, we adopt a definition or characterization for parental unfitness in relation to child custody in a marital dissolution proceeding: Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Johnson*, 214 Kan. 780, 522 P.2d 330 (1974); *In re Christina P.*, 175 Cal.

App. 3d 115, 220 Cal. Rptr. 525 (1985); *Guardianship of a Minor*, 19 Mass. App. 333, 474 N.E.2d 192 (1985). Cf. *Matter of Adoption of JLP*, 774 P.2d 624 (Wyo. 1989) (termination of parental rights on account of a parent's unfitness).

We have held that although a parent's extramarital conduct does not necessarily determine a child custody issue, such sexual conduct may be considered in determining custody of a minor child affected by a marital dissolution proceeding. *Dunne v. Dunne*, 211 Neb. 636, 319 N.W.2d 741 (1982). See, *Krohn v. Krohn*, 217 Neb. 158, 347 N.W.2d 869 (1984) (although the mother engaged in extramarital activity at her home while her two minor sons "were in, around, and about the house," there was no showing that "the boys were exposed to the activity or that they were damaged in any way by the sexual conduct of their mother . . . ." 217 Neb. at 161, 347 N.W.2d at 872); *Mace v. Mace,* 215 Neb. 640, 341 N.W.2d 307 (1983) (the mother engaged in extramarital sexual activity at the minor children's residence, but "[t]he record discloses that the live-in relationship was of but a brief duration, and has now ended. Although [the mother] had planned to marry [her extramarital sexual partner], she has since reconsidered those plans. This evidence alone did not establish that [the mother] was an unfit parent." 215 Neb. at 651, 341 N.W.2d at 314).

When child custody must be decided in a marital dissolution proceeding, neither parent is presumed to be more fit than the other or granted custodial preference on the basis of gender. *Kringel v. Kringel*, 207 Neb. 241, 298 N.W.2d 150 (1980); *Turner v. Turner*, 205 Neb. 6, 286 N.W.2d 100 (1979). See, also, § 42-364(2).

In determining a child's best interests in custody matters, a court may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and

satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension regardless of chronological age, and when such child's preference for custody is based on sound reasons; and the general health, welfare, and social behavior of the child.

*Christen v. Christen*, 228 Neb. 268, 271-72, 422 N.W.2d 92, 95 (1988). See, also, *Gerber v. Gerber*, 225 Neb. 611, 407 N.W.2d 497 (1987); *Grace v. Grace*, 221 Neb. 695, 380 N.W.2d 280 (1986).

Applying the foregoing principles to the record presented in this appeal, nothing indicates that Susan's sexual conduct has been, or likely will be, a detriment, or otherwise injurious, to Travis Ritter. Consequently, we conclude that both Susan and Gary Ritter are parents fit to have custody of Travis. What is more important, however, is the respective environments which each parent offers Travis in view of the fact that his parents are unable to live together.

While availability of Travis' playmates might be placed on a lower level for consideration in the custody question, other features of Travis' custody with Gary Ritter raise more practical, and yet critical, considerations in the child custody question. While Gary lives in Murray, he works in Omaha. There is no prospect that Gary's employment situation will change within the foreseeable future. This necessitates a babysitter for Travis during the period from 9 p.m. to 8 a.m. for each of the 5 days during which Gary works throughout the week and results in 11 hours of babysitting for Travis while Gary is working and traveling to and from work. When Gary sleeps during the day, or tries to sleep, someone will have to take care of Travis. Assuming that Gary will sleep at least 6 hours during the day, somebody, presumably a babysitter, will have to attend to Travis for 6 hours, which brings the babysitting time for Travis to 17 or 18 hours per day for 5 days of each week. With no reflection on Gary and his desire to be a good parent to Travis, even with the 2 days each week when Gary is not working and traveling to work, the vastly substantial amount of Travis' life will be spent with a babysitter.

On the other hand, Susan has an established routine with

Travis and Melissa. Susan works from 8 a.m. to 5 p.m. and leaves the children at a day-care center while she works. Susan is able to call upon Travis' grandparents, if and when the need arises. Cf. *Kringel v. Kringel, supra* (availability of grandparents produced a stable living environment for a child affected by a marital dissolution action and was a consideration in a child custody question). The time which a parent is able to devote to a child is a consideration in resolving a child custody question in a marital dissolution proceeding. See *Mace v. Mace,* 215 Neb. 640, 341 N.W.2d 307 (1983) ("The mother is able to spend more time with the children than is their father, a medical student with several years of residency training ahead of him." 215 Neb. at 651, 341 N.W.2d at 314). See, also, *Peterson v. Peterson,* 224 Neb. 557, 399 N.W.2d 792 (1987); *Turner v. Turner,* 205 Neb. 6, 286 N.W.2d 100 (1979).

Another factor regarding the custody of Travis Ritter is his physical separation from Melissa, with whom he has a strong sibling bond, if custody is granted to Gary Ritter. In *Boroff v. Boroff,* 197 Neb. 641, 648, 250 N.W.2d 613, 617 (1977), this court noted:

> Although this court has acknowledged that it is sound public policy to keep children together when possible, considerations of public policy do not, in all cases, prevent the splitting of the custody of the children when a marriage is dissolved; rather, the ultimate standard is the best interests of the children. [Citations omitted.]

See, also, *Richey v. Richey,* 216 Neb. 565, 344 N.W.2d 642 (1984); *State ex rel. Hamilton v. Boiler,* 159 Neb. 458, 67 N.W.2d 426 (1954); *In re Guardianship of Herten,* 127 Neb. 88, 254 N.W. 698 (1934).

The record is abundantly clear that Travis enjoys a healthy, loving, and close relationship with Melissa. In view of the testimony of witnesses and beyond the testimony of the parties, it appears likely that separation from Melissa will have a detrimental effect on Travis. The record leads to the conclusion that it would be in the best interests of Travis that he not be separated from his sibling, Melissa.

As we have mentioned earlier in this opinion, the district court expressed no determination regarding the best interests of

Travis Ritter in relation to the child custody issue. Perhaps implicit in the district court's custody order is a determination of Travis' best interests. Nevertheless, we conclude that the best interests of Travis require that his custody be granted to Susan Ritter and that, therefore, the district court abused its discretion in granting custody of Travis to Gary Ritter. Consequently, we reverse the district court's judgment concerning custody of Travis Ritter, and, on remand, the district court shall enter its order granting custody of Travis to Susan Ritter in conformity with our decision and opinion issued today in this case.

In view of our decision, it is unnecessary to consider Susan Ritter's question about her visitation rights regarding Travis, and it is equally unnecessary that we consider Gary Ritter's cross-appeal on the issue of child support from Susan. However, as a consequence of the reversal obtained in this appeal, the district court, on remand, shall, as soon as practicable, hold a hearing to determine the questions of Gary Ritter's visitation rights regarding Travis Ritter and whether Gary Ritter shall pay child support for Travis.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.